Good morning, Your Honors. And the case at bar right now is that we have a narrow issue of whether the petitioner has satisfied the clear probability evidence in terms of whether his life or freedom would be threatened if he goes back to China. Because all the other issues in terms of jurisdiction standard reviews are uncontested. Well, let me focus you just in terms of, yeah, I think that you've got what the issue is. But for you to prevail, we have to believe that a different result is compelled, all right? And let's say you make, if your argument is reasonable, but then the other argument is reasonable, you lose. You have to show that it's compelled. So I have some concerns. It doesn't appear that an adverse credibility was found here specifically. So we have to presume what the petitioner said is true. But when I look at everything that the petitioner says, it's not, I'm having trouble finding that to be a really compelling case. And that he, you know, the IJ seems to have problems with him saying, well, you didn't get anything translated, you didn't do that, you didn't do this. But then if we get it down to the facts, the best facts for your client, your client asserted that he converted to Quan Tao after he came here. Yes. All right. Which, and he says that it's banned in China and that his family in China, he says, has been persecuted by the Chinese government because of his conversion to I Quan Tao. And I guess he says that someone in the family was demoted, but we don't, I guess you have to decide if you make, but he says that that was the case and that he also says something to the effect, he sent some documents, but they didn't get them. And then also he says that his, he's not in contact with his wife right now, but supposedly that he's supposed to tell your husband to report to the security people and then he's going to be locked up. Right? Now, we don't have the direct testimony from the people saying that that was said. He's kind of doing the layers of hearsay, right? Well, that's the case because there's no way you have any direct evidence from China at all, because it's only based on his credible testimony in terms of what he had heard from back in China. And there's no way, as we have addressed in our opening brief in advance, actually, from page. Okay. He wasn't persecuted when he was there because he didn't even have this ground. No. Okay. So we have no past persecution. That is not the issue. So the question is just, is this enough here? Yes. Well, the thing is that in our. And obviously the BIA thought, you know, where's the beef? You know what? This just isn't enough. It's you know, we're not saying that, but you have to tell me why that would compel another result. Well, there's no way he could have had any credible evidence from directly from China. All he had to do is in asylum case itself. It has to based on the fact that the objective evidence include the production of documents and or actually all by credible and persuasive testimony. What did the country condition report show about this? Well, the country. Well, that is issue here. Also, that was raised by the government. The opposition brief is in last item in this. The country report does not specifically mention equine dog, but in our addition, original application for asylum. We did include this very specific evidence of an article which was published in 2002 by a Chinese China press talking about this equine dog, because this equine dog is not a tourism, which has originally originated 2000 years ago. It is the offshoot of a tourism, which occurred in 1932. What did the article that you submitted say? I submitted. I'm going to give it to the court right now. If it's the court with the. What's the gist? What's the gist of it? The gist of it is like it was originally in 1932 by a person who actually was considered a hooligan. The thing is that during that period of time, China was still in the Civil War or in the anti-Japanese invasion. After 1949, the Communist Party, the Communist People's Republic of China specifically banned this equine dog. It is like an underground tourism banned by China. Does that say anything? Just like the underground Christian church right now is banned in China as well. Does that say anything about what's going on in China now with respect to it, or is this just the history? It is history, and it's also going on. That's why I'm referring to this specific article, which was published in 2002 regarding this issue here, which is also in the original records. What I'm just trying to bring this up to the judges right now is that this is a very important issue here, because it was not raised during the IJ's denial, nor even raised by the BIA, but it's the first time raised by the government in this opposition brief. But it's evidence before the court, so the court could have said, okay, you have that article, then you have a country report that doesn't say anything about equine tau, so why wouldn't it be reasonable to conclude that it's not something people are being persecuted for? The country report is an all-encompassing report. It does not include everything which is for something like equine tau, which might not be a major movement in China. It was actually historically banned in China, and this article specifically talks about the recent actually banning of this movement in Tianjin City, which is the headquarter of the equine tau. And that whole thing tells us that China is still banning this movement, and anything to do with it would have raised the suspicion by the Public Security Bureau. The visit by the Public Security Bureau to his home was a direct result to his sending material back to China, which is credibly testified by Mr. Wu during the asylum application in court. And that part, which is not controversial in RJ, basically make this assumption that, okay, he thinks it's not believable. He is actually substituting his own idea of reasonableness with whatever is occurring in China, because Mr. Wu has personal experience. He lived in China for a majority of his life. He knew what would happen if something like that happened. It means something. It means that he is going to be persecuted by China if he goes back to China, because his family members had been summoned, and the fact that his mother-in-law's house was searched for a specific purpose of searching these materials, that fact alone tells him that he is being targeted. And we, in our five pages of argument in this particular issue here, we have sufficiently established the fact that these testimonies were credible, and the law does not require us to provide in this asylum case the – let me just write this. The objective evidence component, because we're not trying to prove that he had a past persecution. We're only trying to prove that he is going to be persecuted if he goes back to China. So the objective components of evidential rule is that he had either produced the specific documentary evidence, or by credible persuasive testimony. What did you prove would happen to him if he went back? What did I? Well, the thing is that you don't – in this instance, we could not prove anything, because he converted into – No, I mean what happens to people who – Oh, if they go back to China. If they were being persecuted, they would be sent to prison, labor camp, whatever. And no matter how much you have changed in China, some basic principle, some basic rule of persecution never changes. And is that information in that article? Yes. That people who practice this faith will be put into a labor camp? That's right. And that's why this article is so important here, because since it was never mentioned by the IJ or the BIA, so they were never put into the brief here, and it's first raised by this opposition brief, so that's why you need to present to the court this particular article, which specifically deals with this issue. And that was presented to the IJ? Yes, of course, in the whole package of the original application for asylum. Okay. Did you want to reserve some time for that? Yes, I want to reserve like four or five minutes. Thank you very much. Thank you. Good morning. Good morning. My name is Joanna Watson. I'm here on behalf of the Attorney General of the United States. And as you're aware, this is an immigration case in which the petitioner, Mr. Wu, lawfully arrived in the United States in 1996, did not begin his practice of Yiquan vow until 2000, did not apply for asylum until, I believe, 2003, seven years after. So we don't have that before us anyway. Right. He's not contesting that. Now, do you concede that the IJ did not make a credibility, an adverse credibility finding? Yes. I do. It seems like the IJ didn't believe. He kept mentioning things like, I'm skeptical, that's skeptical, that doesn't sound right, all of that. But there's no specific. No, there was no specific adverse credibility finding in this case. So then he gets, what he says is presumed credible. Yes. But the documentation that's in here was all partially translated. And, in fact, the article that Petitioners' Counsel is referring to was a summary translation. And the portion that Petitioners' Counsel is referring to is not even in that summary. It does not say that Yiquan vow is banned in China. So what is the evidence on that article? Because obviously you argue there's a country report that doesn't talk about persecution for that. What does that article, the article's in the record, so what does it say? The article that he's claiming establishes that he's more likely than not to be persecuted. It gives a slight little history about a Taoist priest. Does it say anything about people being sent to labor camps? No, it does not say anything about people being sent to prisons or camps or anything to that effect. I mean, it's a one-page summary on a several-page article that was actually not accepted by the immigration judge because of the translation. And where did the article, where did it supposedly appear in the China Daily or something? It's just called QIAO, was the first name, Bao News, dated March 15th. So it wasn't even, it wasn't admitted into evidence? No, I don't believe it was accepted because it was a partial translation. It said summary translation and parenthetical, and it didn't even say who translated it. And it's summarizing, so it's not even as if it translated the first page of it. Okay, leaving aside the translation problem, assuming it came into evidence, you're saying it doesn't even lay a glove on. It says practically nothing about the religion. It doesn't say... I wonder if we're talking about the same thing. Counsel says it sounds like a den of iniquity there, and you say it doesn't say anything. And I guess we'll look and see. If I can approach, I can... Well, is there a record number there? Yes, it's AR-169. Okay, we'll take a look. I can read it to you. It really, it says nothing about the religion. In fact, none of the articles in here say anything about the religion being banned or anything to that relation. It discusses Christianity and Falun Gong and other religions, but there's nothing about Yiguan now. And, in fact, there's nothing in the record that compels a contrary conclusion. The documents that he says he mailed to his daughter in 2001, we don't even have a record that they were mailed. We don't know that they were actually intercepted by the Public Security Bureau. Well, so what do we do with, since the court didn't make an adverse credibility, what do we have to assume is our record here? That's what gets a little bit dicey. If the court had said, you know, I don't believe you, and the reason I don't believe you is because that, you know, either the vagueness of your testimony or there's no record you even mailed it or that, you know, layers of hearsay. I think it's a combination of the testimony and the documents that are in the record that don't, there's nothing that says it's banned. There's nothing that says people will be persecuted. There's nothing in the record from China that says, that shows, or indicates that the Chinese officials are even looking for him, are aware of his practice in the United States. But he does put the statement in, she told me that if, that they want, you know, that the security ordered me returned and that when I come back I will be jailed, I'd be interrogated and jailed. That statement's in the record, right? I believe he made a statement that he fears that he's going to be. No, but he made a statement of what his wife said. Didn't he make a statement of what his wife said? AR-162 Navy, that to inform her husband Wu to return to China as soon as possible so he may report to the Public Security Bureau upon return and receive interrogation and investigation and to be arrested and imprisoned right away. He made the statement, but when he testified, he did not indicate anything to that effect. There's no testimony whatsoever. His testimony was that his mother-in-law's house was searched, that he sent documents that weren't received. Well, so where does that statement come from then? I believe it was the statement with his application, his asylum application. All right, and it wasn't in his testimony? No. And again, the standard is compelling a different conclusion than that of the agency, and it's pure speculation that the officials are even aware of his practice. I mean, all the documentation in the record, I mean, about his wife or his mother-in-law, I mean, that's directed at them. There's nothing to suggest that the officials are aware of his practice and that he would be persecuted. And there's nothing in the record that it's banned or people are even persecuted. Therefore, the agency reasonably concluded that he did not have a clear probability of persecution upon his return. That's it. Ms. Watson. Thank you. Mr. Chi, when you get up there, would you just confirm that we're talking about the same article? Ms. Watson refers to it as AR-169. Is that the same document you're referring to? Yes, Your Honor. Okay. And actually, I just want to apologize to the Court about this translation part. It was done a long time ago. But there is just the basic stuff is there also, but I believe if the Court would review this document and find out exactly what it is. Well, we can't. We're stuck with what the translation is, even assuming. But if the Court didn't admit it, then because it's only, you know, you can't, it would be like, I mean, you can't just pick and choose. I could take something and redact it, and then it doesn't say what the article really says. I read the transcript, but I don't recall any part of that which the Court did not admit as evidence at all. And there might be some discrepancies here. All right. But limiting yourself then to the part that's translated, which you would have to limit yourself to, you can't expect this Court to go out independently, hire a translator, and make that part of the record when it wasn't in front of the IJ. Where in that part that's translated does it say that people would be arrested and jailed, like you said? Well, the part that says that it's the biggest reactionary organization is which part tells us that the government of China deemed this as a reactionary organization. When it's a reactionary organization, it is deemed that anything they do is against the law in China. Anything against the law would be sent to prison for that. All right. But it doesn't say they go to prison. Is the word prison in there? Well, if the Court deems this portion of translation as the only evidence admitted, it does not say this was sent to prison. But it can only be which you can clearly infer from this fact that if it's outlawed in China, once it's outlawed, it is... Well, then the way you need to argue that is if it's an inference that you're asking us to make is one thing. If you're saying that it says in the article that people would go to prison, they'd be arrested and go to prison, that's different. It's not just a picky, picky thing. It's what do the words say. I would admit that this translation does not specifically mention about prison, but the article in the Chinese itself did mention, as I read it. And it could be the error during the initial application submission that was not included. But I would submit to the Court in this particular aspect that this particular portion, we can, if the Court remanded this case to the IEJ, we could translate the whole article and submit to the IEJ here. And also I would refer to this particular issue about the speculation on the IEJ part of it in terms of whether he had credibly testified to the materials sent by China and also whether the policeman did come to his wife. We have documentation to show that his wife was summoned by the police already. There's document in the evidence. And that part was indisputable. And also the part that he could not testify to exactly whether the policeman or how many people were there because he just wasn't here to see it. He said he didn't know whether his wife responded to the summons, too, correct? That's right. Because he doesn't have contact with her now? As of now, as we're speaking right now, I don't know. And at that time, at the time of submission of the application and also at the time of testimony in the Court of IJ. It seemed that they weren't having contact at that time. Was that because they were divorced or what was that? No, they were not divorced at that time. No, they were not divorced at all. They were still in contact with each other. In terms of, you know, their marriage itself, if that's what you're asking for. Well, it seemed that the record, he said in the record that he wasn't having contact with her at that time, and that's why he didn't know whether she responded to the summons. After the police searched and after the police summoned her. And he did not want to burden her or he did not want to further incriminate her. That's why he refrained from contacting her, which is happening in China. You don't know whether your phone line will be intercepted or not in circumstances like this. And also when they were aware of the fact that you have sent documents back to China, which they deem is to be a reactionary in China, which means that you're anti-government. If that's the case, of course you will be under surveillance for that kind of purpose. That does it. Good morning. Thank you, counsel. Thank you, Your Honor. The case just argued is submitted. We'll stand and recess.  Thank you very much. Thank you.
judges: Hall, Silverman, Callahan